1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JACK RAY VICTOR,

               Petitioner,              No. 1:07-cv-00758 ALA (HC)

      vs.

JAMES WALKER, Warden,          <u>ORDER</u>

               Respondent.

_____/

      Petitioner Jack Ray Victor is a state prisoner represented by counsel.  Pending before this Court are Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (Doc. 1), Respondent's answer to the application (Doc. 26), and Petitioner's  traverse (Doc. 31). Petitioner alleges several violations of his federal constitutional rights.  For the reasons set forth below, Petitioner's application for writ of habeas corpus is DENIED.

**I**

      On November 3, 2003, a jury convicted Petitioner of first-degree murder, with a gun-use enhancement, and a special circumstance for having previously committed murder, in violation of Cal. Penal Code §§ 187, 12022.53(d), 12022.5(a)(1), 190.2(a)(2).  (Doc. 26).  The jury also convicted Petitioner of being an ex-felon in possession of a firearm, in violation of Cal. Penal Code § 12021(a)(1).  *Id.*  The trial court sentenced Petitioner under the Three Strikes law to a double term of life-without-the-possibility-of-parole for murder, plus a twenty-five-year-to-life

1    enhancement for using a firearm, and a six-year stayed term for possessing a firearm.  *Id.*

2                                                        **A**

3          Viewed in the light most favorable to the prosecution, as the prevailing party, the

4    California Court of Appeal that reviewed Petitioner's direct appeal summarized the evidence

5    presented at trial, and credited by the jury, as follows:

6

7          On February 7, 2002, the day Marquez was killed, defendant was 54
           years old and Marquez had been his friend since both were children.
           Marquez lived in a motor home that belonged to defendant, parked
8          on defendant's property in Atwater. According to defendant, Marquez
           was "like a brother" to him.

9
           That morning, defendant picked up Marquez to drive him to a
10         doctor's appointment. This was also the day on which defendant
           was to turn himself in to federal authorities in Fresno to be returned
11         to prison for a parole violation. In addition to the doctor's
           appointment, Marquez was going to accompany defendant as he
12         collected money from acquaintances to place in his prison account.
           The plan for raising money included selling a gun they had with
13         them.

14         Defendant inhaled some methamphetamine and, after a stop for beer,
           the two friends proceeded to the home of Fred and Patricia Wellington
15         and their six children, a farmhouse located in an almond orchard in
           Atwater. Fred Wellington had known defendant for many years and
16         considered him and Marquez to be his friends. According to
           defendant, he went there because of a debt Fred Wellington owed him,
17         which  Wellington  paid  in  the  form  of  $100  worth  of
           methamphetamine.

18
           Defendant and Marquez entered the house and walked into Fred
19         Wellington's bedroom, where he was lying in bed with a cold. Patricia
           Wellington was also in the room. Marquez gave Fred Wellington a
20         hug and left the room. Then, according to both Wellingtons, defendant
           explained that he was going to kill Marquez, whom he blamed for the
21         parole violation. Defendant called Marquez a "rat" and said three
           times that he would kill him. Fred Wellington told defendant not to
22         think that way. Patricia Wellington did not take the statements
           seriously, although she saw the handle of a gun protruding from
23         defendant's pocket.

24         Defendant and Marquez had been arrested together several months
           earlier, in April 2001, leading to the revocation  of the parole
25         defendant  was  serving  for  a  1983  federal  methamphetamine
           manufacturing conviction. Two Atwater police officers saw them at
26         3:00 a.m. sitting in a pickup truck parked at a commercial building

                                                        2

defendant owned.

The officers knew defendant was on parole and conducted a parole search of the pickup. They found a loaded .22 caliber revolver under the passenger seat, where Marquez was sitting, and arrested and searched both men. A .22 caliber bullet was found in the pocket of defendant's jacket and 14 more rounds were in Marquez's pants' pocket.

Marquez told the officers the gun belonged to him and claimed there was a bullet in defendant's coat because he (Marquez) had been wearing the coat earlier. One of the officers said that was implausible because Marquez was much larger than defendant and could not have fit into his coat. Marquez stood six feet four inches tall and weighed over 300 pounds, while defendant was five feet eight inches tall and weighed 150 pounds. Confronted with this, Marquez admitted he had never worn defendant's coat. Two or three weeks before Marquez's death, defendant learned that his parole had been revoked on the basis of these facts.

After defendant  told the Wellingtons he would kill Marquez for this reason, he left their house, and Fred Wellington followed. Outside, defendant said he wanted to leave the property the back way through the orchard, instead of driving onto the highway, the way he had come in. Fred told him the landlord forbade using the back way. With Marquez in the passenger seat, defendant drove off into the orchard anyway.

The Wellingtons watched the car go into the orchard. Through the trees, they saw it stop about 100 yards from the house. Then they heard gunshots. After a short time, the car came back out of the orchard with only defendant inside, passed the house, and left the property via the highway. As the Wellingtons prepared to walk into the orchard to find out what happened, their telephone rang. Defendant was calling to ask if they heard anything. Fred Wellington said no, and then he, Patricia, their son, and his girlfriend went to the back of the orchard.

They found Marquez shot dead, lying on his back on the ground, against springs of an abandoned mattress. He had two gunshot wounds in his chest and a third in the back of his neck. According to a medical expert's testimony, it was most likely  that Marquez was shot in the back of the neck first, turned, and then was hit in the chest. The neck wound was non-fatal, but the chest wounds, which pierced the heart and aorta, caused death within five minutes. The shots were fired from a distance of at least six feet. The autopsy also revealed track marks on Marquez's arms, a syringe hidden in his sock, a portion of a plastic bag in his stomach, and a large amount of amphetamine and methamphetamine in his blood. The bullets in Marquez's body and the spent shell casings found at the scene were matched to the gun later found in Victor's possession.

3

The Wellingtons waited more than an hour before calling the police. When they did call, they did not tell their whole story: They omitted the fact that Victor told them he would kill Marquez, and they might have omitted that they heard the gunshots. The Wellingtons explained that the delay and omissions happened because they were afraid of retaliation by members of Victor's family. Patricia Wellington additionally feared that someone might think she could have done something to warn Marquez. She also said she "didn't trust the system." Fred and Patricia both admitted they had used methamphetamine in the past. Fred traded in methamphetamine by barter, giving the drug to acquaintances in exchange for auto parts and other property. The Wellingtons disclosed the previously omitted facts in another police interview more than two months later.

Sheriff's deputies located defendant at his business, an auto salvage yard, the day of the shooting. A SWAT team surrounded the yard for six to seven hours as defendant made statements to the deputies and held the murder weapon, a nine-millimeter semi-automatic assault pistol, to his head. According to deputies at the scene, these were among the statements defendant made: "'I done something bad to someone today'"; "'This gun did something bad today'"; "'You will match the ballistics of this gun'"; "'You just don't know about it yet'"; "'You haven't found him yet'"; "'That guy was with me when I got busted by Atwater PD for having a bullet in my pocket'"; "'That bullet was in his coat. He told them that, but they didn't care.'" Defendant finally was persuaded to set the gun down, and the deputies fired a bean bag round at him from a shotgun. The bean bag stunned defendant briefly and the deputies rushed toward him, but then he reached for his gun, prompting the deputies to shoot at him with bullets. One hit him in the armpit, and the deputies took him into custody. He was found to have a potentially fatal amount of amphetamine and methamphetamine in his blood.

The district attorney filed an information charging defendant in count 1 with first degree murder. (Pen. Code, § 187. 1) For sentence enhancement purposes, the information alleged that defendant had previously been convicted of murder (§ 190.2, subd. (a)(2)) and personally used a firearm in committing the current offense (§§ 12022.5, subd. (a) & 12022.53, subd. (d)). In count 2, the information charged defendant with being a felon in possession of a firearm. (§ 12021, subd. (a)(1).) As an enhancement to both counts, the information alleged that defendant had a prior strike conviction under the three strikes law.

While the district attorney's investigation of the crime was under way, the Wellingtons entered a witness protection program. They asked to be placed in the program because, in the weeks after defendant's arrest, they received harassing telephone calls and saw suspicious cars driving on the property late at night. Someone destroyed their mailbox. Poisoned meat was thrown to their dog from a car, and a friend of Victor advised them to leave town. The program relocated

them to another county.

At trial, defendant testified that he shot Marquez in self-defense. In his version of the story, Marquez had the gun when they were at the Wellingtons' house. Defendant said he drove into the orchard with the intention of leaving the property by the back way. He did so because he planned to drive while drinking the beer he had purchased earlier and did not want to be on the highway while doing so. He stopped in the orchard to get beer out of the trunk for himself and Marquez. Then, he claimed, after both men got out of the car, Marquez demanded some of the methamphetamine defendant had received from Fred Wellington. Although defendant and Marquez had used methamphetamine together many times before, defendant did not want to give him any that morning. He reasoned that the doctor's appointment was part of the process of applying for Social Security disability benefits, and defendant thought Marquez's chances of receiving benefits would be jeopardized if he were intoxicated. Defendant testified as follows about what happened next:

"Q What did you tell him?

"A I told him, 'No, man. You got a damn doctor's appointment at 10:30 and stuff. You're stupid if you do any more now.'

"Q What was his response?

"A He said it was too late, 'I already did some this morning.'

"Q How did you react to that?

"A I told him, 'You stupid ass-hole. You're going to lose all that damned money just to get loaded.'

"Q What did he do?

"A He said, 'I'm tired of you fucking telling me what to do' and pulled the gun.

"Q Let me slow you down. Describe to the jury how that happened.

"A Well, when I told him that he just said 'I'm tired of you fucking telling me what to do.' He pulled the gun out of his waistband.

"Q What did you do?

"A I knocked it out of his hand.

"Q Then what happened?

"A I grabbed it off the ground and backed up.

1    "Q Then what?

2    "A Well, I grabbed it off the ground and I started to go back and he
     looked like he was coming towards me and I started pulling the
3    trigger.

4    "Q How many times had you shot?

5    "A I don't know.

6    "Q Do you know what his reaction was after he got shot?

7    "A He just stood there for a second and then fell down.

8    "Q Okay. How did he fall down?

9    "A I don't know. He just fell down and on his back.

10   "Q Did anything -- did you observe him after that?

11   "A No, I threw the gun in the car and closed the trunk and left."

12   On cross-examination, defendant said he fired because Marquez
     greatly outweighed him and he was afraid. He also testified that he
13   fled instead of waiting for the police and telling them it was
     self-defense because he had "dealt with the law before and didn't want
14   to talk to nobody." He denied telling the Wellingtons he was going to
     kill Marquez. When asked why he did not run away from Marquez
15   instead of shooting him, defendant said he "didn't think of it."

16   As part of its cross-examination of defendant, the prosecution played
     a tape of a telephone conversation between defendant and Marquez's
17   mother. Mrs. Marquez called defendant when he was in the hospital
     after the SWAT team shot him. Defendant admitted at trial that he
18   made numerous false statements during this conversation. These
     included a statement that defendant did not know anything about the
19   shooting and could not understand why he was a suspect. He also told
     an elaborate story that defendant and Marquez went to a store where
20   Marquez introduced defendant to some men he said were his cousins,
     drove away with them in a black Firebird, later returned to borrow
21   defendant's car, and finally returned the car to defendant's shop while
     defendant was away. Defendant said the last time he saw Marquez was
22   when Marquez borrowed the car. He told Mrs. Marquez he hoped he
     might find out who killed Marquez when he got out of the hospital and
23   had a chance to talk to people.

24   Tonya Martin, who had known defendant all her life and sometimes
     carried drugs for him, also testified at trial. She witnessed an argument
25   between defendant and Marquez. Defendant told Marquez he could
     have done more to prevent defendant from being held responsible for
26   his parole violation, and that it was Marquez's fault that defendant was

6

going back to prison. When Marquez replied that he would do anything for defendant, even die for him, defendant said, "'You just might have to.'" Defendant was angry, Martin said, that he had to return to prison just because he had a bullet in his pocket, an offense he considered trivial. When she brought her information to the district attorney's office, Martin asked for assistance in moving out of town for her safety and the safety of her children, saying she feared defendant's friends.

The defense presented testimony of several witnesses regarding past violent acts by Marquez to support the self-defense claim. A woman testified that Marquez threatened her with a knife and a police officer testified that Marquez admitted doing so. Another police officer stated that Marquez admitted he pointed a rifle at a noisy neighbor. A detective testified that on another occasion, Marquez behaved aggressively and said it would take more than mace and three officers to subdue him.

The jury found defendant guilty as charged and found the gun-use-enhancement allegations true. The trial court found the prior-offense allegations true. It imposed a sentence of life without the possibility of parole for count 1 and doubled it for the prior strike. It also imposed a consecutive sentence of 25 years to life for personal weapon use pursuant to section 12022.53, subdivision (d). The additional weapon-use enhancement pursuant to section 12022.5 was stricken. The court imposed the upper term of six years for count 2 and stayed it pursuant to section 654.

*People v. Victor*, No. F044484, 2006 Cal. App. Unpub. LEXIS 17 (Cal. App. Jan. 3, 2006).

**B**

On December 11, 2003, Petitioner filed a timely notice of appeal from the trial court's judgment in the California Court of Appeal for the Fifth Appellate District.  (Case No. F044484). In his direct appeal, Petitioner alleged, inter alia, that he was deprived of several of his federal constitutional rights during his trial.  The Court of Appeal rejected each of his federal constitutional claims in a reasoned opinion on January 3, 2006.  *Victor*, LEXIS 17.

Petitioner filed a petition for review in the California Supreme Court.  It was summarily denied on April 12, 2006.  (Case No. S14061).  Petitioner did not seek collateral review of the trial court's judgment and sentence under state law.

**C**

Petitioner filed a timely application for a writ of habeas corpus on May 8, 2007, in the

1  United States District Court for the Eastern District of California.  (Doc. 1).  Petitioner filed a

2  first amended application for writ of habeas corpus on June 11, 2007 (Doc.10).  On February 22,

3  2008,  Petitioner filed his second amended application for writ of habeas corpus. (Doc. 22, Supp.

4  Doc. 25).  In his answer to the Petitioner's application, Respondent has conceded that

5  Petitioner's federal constitutional claims were exhausted in state court.

6                                                               II

7         Petitioner has raised nine federal constitutional claims in his application for a writ of

8  habeas corpus.  As noted above, the California Court of Appeal rejected each of these claims on

9  Petitioner's direct appeal.  Because the California Supreme Court summarily denied review, this

10  Court must look to the California Court of Appeal's reasoned decision rejecting Petitioner's

11  claims to determine whether the state court erred in adjudicating Petitioner's federal

12  constitutional claims.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Avila v. Galaza*, 297

13  F.3d 911, 918 (9th Cir. 2002) (explaining that the federal courts will generally "look through"to

14  the last reasoned opinion on the claim); *see also Plumlee v. Del Papa*, 465 F.3d 910, 917

15  (9th.Cir. 2006) (holding that when determining whether state court decision is contrary to or

16  involved unreasonable application of federal law, federal habeas court reviews the "last reasoned

17  decision by a state court") (citation omitted).

18                                                               III

19         Petitioner raises the following federal constitutional claims in his § 2254(a) application

20  for habeas corpus relief:  (1) his right to due process was violated because the trial court erred in

21  admitting prior bad acts; (2) his right to due process was violated because the trial court erred in

22  failing to instruct on the defense of imperfect self defense; (3) his right to due process was

23  violated because the trial court erred in permitting a police officer to give improper opinion

24  testimony; (4) his right to due process was violated because the prosecution committed

25  misconduct during closing arguments that denied Petitioner a fair trial; (5) his right to due

26  process was violated because the trial court erred in admitting hearsay evidence; (6) his right to

due process was violated because the trial court erred in admitting the testimony of four witnesses regarding their fear of retaliation; (7) his right to due process was violated because the trial court violated *Blakely v. Washington*, 542 U.S. 296 (2004) in its sentencing decision; (8) his Sixth Amendment right to counsel was violated because his defense counsel ineffectively represented him; and, (9) his right to due process was violated because cumulative errors support the application for habeas corpus relief. (Doc. 22). Respondent concedes that this application was timely filed, and his federal constitutional claims were exhausted in Petitioner's direct appeal of his conviction pursuant to 28 U.S.C. § 2254(b)(1)(A). (Doc. 26).

## IV

## A

In enacting the Anti-terrorism and Effective Death Penalty Act of 1996, Congress has limited the power of a federal court to grant habeas corpus relief in § 2254(d). The Supreme Court explained in *Lockyer v. Andrade*, 538 U.S. 63 (2003) that § 2254(d)(1) "circumscribes a federal habeas court's review of a state-court's decision." *Id.* at 70. In *Woodford v. Visciotte* 537 U.S. 19 (2002), the Court instructed that § 2254(d) "demands that state court decisions be given the benefit of the doubt." *Id.* at 24. Section 2254(d) provides as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Thus, this Court's task under § 2254(d) is to determine whether the State court's denial of each of Petitioner's federal constitutional claims was "contrary to, or an unreasonable

1  application of clearly established federal law as determined by the Supreme Court of the United
2  States."

3      In accordance with § 2254(e)(1), a state court's factual findings are entitled to a
4  presumption of correctness and a petitioner has the burden of rebutting this presumption by clear
5  and convincing evidence.  Pursuant to *Brecht v. Abrahamson*, 507 U.S. 619 (1993), habeas relief
6  will be granted if a non-structural constitutional error had a "'substantial and injurious effect or
7  influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328
8  U.S. 750, 776 (1946)).

9                                             **B**

10     The gravamen of Petitioner's application is that his Fifth, Sixth, and Fourteenth
11  Amendment rights were violated during the course of his criminal trial based upon alleged trial
12  court error, prosecutorial misconduct, ineffective assistance of counsel, improper sentencing, and
13  cumulative error.   In his answer, Respondent contends that two of Petitioner's claims cannot be
14  reviewed by this Court because they do not involve federal constitutional questions.

15                                             **1**

16     Petitioner claims his due process right to a fair trial was violated when the trial court
17  admitted evidence during trial of two prior shootings in which Petitioner was involved.[1]
18  Petitioner argues that the trial court erred in admitting evidence of prior bad acts without a
19  preliminary hearing to establish that such evidence met the foundational requirements to
20  demonstrate intent and common plan.  Petitioner contends that this error violated his right to due
21  process because it amounted to prejudicial propensity evidence.  The California Court of Appeal
22  held that this evidence was relevant to overcome the Petitioner's theory that he acted in self-
23  defense because it demonstrated Petitioner's intent and common plan in committing the alleged

24  ───────────────

25  [1] In 1976, Petitioner was convicted of second degree murder for the killing of Larry
    Hicklin and sentenced to four years in prison.  In 1992, Petitioner was tried and acquitted in the
    shooting of Frank Cardoza.  At his trial for that offense, Petitioner persuaded the trier of fact that
26  he acted in self-defense.

1   crime in this matter. *People v. Victor*, No. F044484, 2006 Cal. App. Unpub. LEXIS 17, at *14

2   (Cal. App. Jan. 3, 2006).

3        Where there is no Supreme Court precedent controlling an issue, such as the

4   admissibility of propensity evidence, a petitioner's claim must be denied.  *See Stevenson v.*

5   *Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004), *cert. denied*, 543 U.S. 1191 (2005) ("If there is no

6   Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state

7   court's decision cannot be contrary to, or an unreasonable application of, clearly established

8   federal law.").  In *Estelle v. McGuire*, 502 U.S. 62, 75 (1991), the Supreme Court expressly

9   declined to decide "whether a state law would violate the Due Process Clause if it permitted the

10   use of 'prior crimes' evidence to show propensity to commit a charged crime."  Therefore, under

11   § 2254(d)(1), this Court is barred from reviewing Petitioner's first claim for habeas relief

12   because the Court of Appeal's decision did not violate clearly established Federal law as

13   determined by the Supreme Court of the United States.

14                      **2**

15        Petitioner's second claim is similarly barred from federal habeas review due to a lack of

16   Supreme Court precedent.  Petitioner contends that the trial court erred in omitting the imperfect

17   self-defense portion of CALJIC No. 8.40 which defined the lesser-included offense of

18   manslaughter and, thus, violated his right to due process.   The California Court of Appeal held

19   that while the trial court erred in omitting a portion of the jury instruction, the error was harmless

20   "because another instruction given by the court adequately explained imperfect self-defense."

21   *Victor*, LEXIS 17, at *40.  The Supreme Court has held that "a lesser-included offense"

22   instruction is only constitutionally required in a death penalty case.  *Beck v. Alabama*, 447 U.S.

23   625, 627 (1980); *see also Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he

24   failure of a state trial court to instruct on lesser included offenses in a non-capital case does not

25   present a federal constitutional question.").  As this is not a capital case, Petitioner has failed to

26   demonstrate that he was entitled to a jury instruction defining the lesser-included offense of

1   voluntary manslaughter based on the imperfect self-defense doctrine.

2                                       **3**

3          In Petitioner's third claim, he contends that the trial court erred when it admitted

4   Detective Dover's opinion testimony regarding the credibility of Tonya Martin.  The Court of

5   Appeal held that while the opinion testimony about the veracity of statements by another witness

6   is inadmissable, a party is estopped from asserting as a ground for reversal any error induced or

7   invited by his own conduct.  *Victor*, LEXIS 17 at *45.  The California Court of Appeal held that

8   Petitioner was estopped from raising the issue on appeal because he could not "obtain a reversal

9   of his conviction by claiming that the prosecution asked a witness for an opinion on the

10  credibility of another witness immediately after defense counsel, for tactical reasons of his own,

11  asked the same witness for essentially the same opinion."  *Victor*, LEXIS 17 at *50.

12         This factual finding by the state court  regarding who induced the testimony is presumed

13  correct under §2254(e)(1).  The Petitioner has the burden of rebutting this presumption.

14  Petitioner contends that Detective Dover's opinion regarding Martin's truthfulness was induced

15  by the prosecution.  Petitioner states that, "defense counsel brought up with Dover the fact that

16  Martin could not have heard what she claimed to have heard on February 6th because she was in

17  jail.  Dover repeated his opinion that she was not lying twice, and it was the prosecutor who took

18  this opinion and ran with it."  Petitioner's contention highlights that it was his own counsel who

19  instigated the line of questioning at issue.

20         It is established under California law that a defendant is estopped from raising any error

21  as a ground for reversal if he or she initially invited the error at trial.  *People v. Marshall*, 50 Cal.

22  3d 907, 931 (1990).  In *Leavitt v. Arave*, 383 F. 3d 809, 832-33 (9th Cir. 2004), the Ninth Circuit

23  held that only where the state court expressly invoked the invited error doctrine as the basis for

24  rejection of the claim may it be applied as a state procedural bar.  The California Court of

25  Appeal held that "defendant is estopped from raising this issue under the doctrine of invited

26  error, and also that any error was harmless."  *Victor*, LEXIS 17 at *45.  Under the expressly

1  applied "invited error doctrine," Petitioner is procedurally barred from raising this claim in the

2  instant application.  *Coleman*, 501 U.S. at 749-50.

3      The Petitioner avers that if he is procedurally barred from attacking Detective Dover's

4  opinion testimony as a result of it being an invited error, then Petitioner has a lawful claim for

5  ineffective assistance of counsel.  That claim, discussed infra at IV(B)(8), is also denied.

**4**

7      In Petitioner's fourth claim, he asserts prosecutorial misconduct in violation of his

8  Fourteenth Amendment right to due process.  Petitioner contends that the prosecutor committed

9  prejudicial misconduct by displaying a photograph of Marquez taken while he was alive.  The

10  California Court of Appeal concluded that while this "surprise display of the unadmitted

11  photograph was a naked appeal to the passions of the jury, a stunt that a senior

12  prosecutor...should have known better [than] to perform," the misconduct did not amount to

13  reversible error.  *Victor*, LEXIS 17 at *54.  The California Court of Appeal reasoned that

14  because the evidence of Petitioner's guilt was so overwhelming, such behavior by the prosecutor

15  did not prejudice the jury so as to make the trial fundamentally unfair.  *Id.*  The Petitioner, citing

16  *Donnelly v. DeChristophoro*, 416 U.S. 637 (1974), maintains that this Court should grant relief

17  from that sort of "egregious misconduct."  *Id.* at 647-48.  "The 'consistent and repeated

18  misrepresentation' of a dramatic exhibit in evidence may profoundly impress a jury and may

19  have a significant impact on the jury's deliberations."  *Id.* at 646.  It is not enough, however, to

20  show that the prosecutor's conduct was "undesirable or universally condemned."  *Darden v.

21  Wainwright*, 477 U.S. 168, 181 (1986).  Instead, the question must be whether the prosecutor's

22  conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due

23  process."  *Id.* at 169 (citations omitted).  An "examination of the entire proceedings" must be

24  made to determine whether the prosecutor's [conduct] rendered the proceedings "fundamentally

25  unfair."  *Donnelly*, 416 U.S. at 645.  In light of the evidence that Petitioner purchased the gun

26  two weeks prior to the shooting, told others that he was angry at the victim and that he planned

1   to kill him, and testified that he shot the victim, the Court of Appeal's conclusion that the

2   inappropriate conduct by the prosecutor was unlikely to bear a significant enough impact on the

3   jury's determination of Petitioner's guilt to be deemed a reversible error was not contrary to, or

4   an unreasonable application of, clearly established federal law as established by the United

5   States Supreme Court in *Donnelly*.

**5**

7       In his fifth claim, Petitioner argues that the trial court erred in admitting hearsay

8   testimony in violation of his Sixth Amendment right to confront and cross-examine witnesses as

9   interpreted in the recent Supreme Court decision *Crawford v. Washington*, 541 U.S. 36 (2004).

10  According to Petitioner, the trial court erred in permitting Ray Moore, an investigator, to testify

11  about out-of-court statements made by a witness, Daniel Galindez, who invoked his privilege

12  against self-incrimination and refused to testify at trial.  Moore testified that Galindez told him

13  that he sold Petitioner a gun and ammunition matching the description of the murder weapon.

14  Moore testified that Galindez also told him that Galindez sold Petitioner drugs on the morning of

15  the shooting and that he watched Petitioner use these drugs.

16          "Q Did you ask him during the course of that interview if Jack

17          Victor had purchased a gun from him, from David Galindez?

18          "A Yes, I did.

19          "Q And what was his response; do you recall?

20          "A That he did sell the gun to Jack Victor...."

21  (RT 721:13-17).

22      The California Court of Appeal held that because the hearsay testimony was

23  independently established by separate evidence presented at trial, its improper submission was a

24  harmless error.  The California Court of Appeal determined that "[t]here can be no reasonable

25  doubt that the jury would have reached the same verdict if it had not heard Moore's

26  testimony...." *Victor*, LEXIS 17 at *55.  In *Crawford*, the Supreme Court held that an accused's

1   right to confront witnesses under the Confrontation Clause applies to out-of-court statements

2   introduced at trial. *Crawford*, 541 U.S. at 51. However, for non-structural constitutional error in

3   the admission of hearsay evidence to be reversible, a petitioner must establish that the evidence

4   had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*,

5   507 U.S. at 637. Petitioner argues that the improper hearsay testimony did damage his theory of

6   self-defense because the testimony helped establish the prosecution's theory of premeditation.

7   At trial, however, Petitioner testified that he purchased the gun from Galindez. Another witness,

8   Jonell Dutra, testified that she saw Galindez hand Petitioner the gun. Finally, the gun was found

9   in Petitioner's possession after the standoff with the police immediately prior to his arrest.

10   These facts, admitted at trial, serve to establish the same facts contained in the improperly

11   admitted hearsay testimony by Moore, which was essentially that Petitioner received the gun

12   from Galindez two weeks prior to the shooting. Accordingly, the Court of Appeal's holding that

13   the admission of hearsay testimony was harmless error was not contrary to, or an unreasonable

14   application of, clearly established federal law as established by the United States Supreme Court

15   because it did not have a "substantial and injurious effect or influence in determining the jury's

16   verdict." *Brecht*, 507 U.S. at 637.

**6**

18       Petitioner's sixth claim is that the trial court erred in admitting the testimony of four

19   witnesses who testified that they feared possible retaliation by the family and friend's of

20   Petitioner.[2] Petitioner argues that this testimony, combined with the prosecutor's closing

---

22       [2] During direct examination, Mr. Wellington explained the reason he delayed in calling
the police in the following colloquy:

23          "Q Now you waited apparently about an hour and 15 minutes,
       some time over an hour before you called the police. Why was

24          that?
       "A I think it was because I was scared.

25          "Q What were you scared about?
       "A Well, you don't see a dead person in your property and then I

26                         (continued...)

[2](...continued)
      know the people, the family of Jack's.
      "Q Family of who?
      "A Jack's.  If we called in, you know, we're going to get some
      kind of repercussions, you know.
      "MR. GARCIA: Objection, Your Honor.
      "THE COURT: Well, I'm going to admit it not go to the truth of
      the matter asserted, but only to show why he waited an hour and
      15 minutes to call in.
      "MR. MORSE: Thank you.
      "Q Were you worried about possible repercussions for you or your
      family if you called the police?
      "A Yes.
      "Q Were you worried because you knew Jack Victor and Jack
      Victor's reputation?
      "A Yes."
(RT 129-130:9-3)

    Mrs. Wellington testified that she feared that people who wanted to impress the Petitioner may be a danger to her and her family.
      "Q Sorry.  Are you okay?
      "A I was worried.  I was scared, I mean, because – I mean, I didn't
      put really much thought into it. I knew this was going to turn out
      ugly, not just – I mean, I was not scared of Jack.  It was just I knew
      that there's so many people that, you know, I used to joke and say
      "Oh, you know Jack Victor, let me touch you" because it was like
      – like a star or something, you know, and I knew that there would
      be some half-minded tweak out there who may want to try to in
      their book make brownie points for him of taking care of us on
      their own, you know."
(RT 223: 5-15).

    April Elmore also testified that she was scared after being a witness in the 1976 killing of Larry Hicklin.
      "Q After you gave that statement to the investigators what
      happened to you?
      "A I was held in protective custody.
      "Q And do you know why you were held in protective custody?
      "A Uhmm, they had a feeling that I should be afraid, which I was."
(RT 563: 16-22).

    Tonya Martin was the fourth witness to state that she had some fear of the Petitioner and his associates.
      "Q Are you concerned for your safety about testifying here today?
      "MR. GARCIA: Objection, Your Honor. Relevance.
      "THE COURT: Overruled.

(continued...)

16

argument violated Petitioner's Fourteenth Amendment right to due process.[3]  Petitioner contends that this evidence showed that the witnesses feared retaliation by Petitioner's associates, not by Petitioner.  Thus, Petitioner argues, the prosecutor's argument made it seem as though the witnesses feared him.

The California Court of Appeal held that the evidence was admissible because it was relevant to establish witness credibility and did not serve as character evidence.  *Victor*, LEXIS 17 at *61.  The Court of Appeal also held that because the defense counsel failed to interpose a contemporaneous objection to prosecutor's closing argument, the issue was not preserved for appeal.  *Id*. at *62 ("objections to a prosecutor's closing arguments must be made at trial to preserve the issue for appeal") (citing *People v. Gurule*, 28 Cal. 4th 557, 627 (2002)).

If a state court, relies on an adequate and independent state procedural bar, federal habeas review is barred.  *Coleman*, 501 U.S. at 729-30; *see also Wainwright v. Sykes*, 433 U.S. 72, 86-87; *Boyd v. Thompson*, 147 F.3d 1124, 1126 (9th Cir. 1998) (holding that federal habeas applications are barred if the petitioner fails to meet a state procedural requirement).  Accordingly, Petitioner's claim is procedurally barred and this Court cannot address it.

---

[2](...continued)
        "THE WITNESS: Am I concerned?  Yes, I'm somewhat.
        "MR. MORSE: Q Why is that?
        "A Because I've been friends of the family with them for years.
        "Q Sorry?
        "A Because I've been friends and they're family, my family.
        "Q Did you express to the detectives that you were concerned
        about staying in town if you were testifying in this case?
        "A Yeah."
(RT 734:11-25).

[3] The prosecutor argued that
        Jack Victor instills fear in people that most of us have never known.
        That's because these ladies and gentlemen, these were his friends.
        These were his friends who were scared to death of him.
(RT 1079:11-14).

**7**

In his seventh claim, Petitioner maintains that his Sixth Amendment right was violated by the imposition of an upper term of six years imprisonment for count II of his felon-in-possession of a weapon conviction, because the trial court relied upon facts not found by the jury to impose the "upper term" sentence.

Petitioner contends that the trial court's sentencing decision violated the rule announced in *Blakely v. Washington*, 542 U.S. 296 (2004). In *Blakely*, the Court held that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

The California Court of Appeal relied on *People v. Black*, 35 Cal. 4th 1238 (2005), in concluding that the imposition of upper terms under California law is unaffected by *Blakely*. *Victor*, LEXIS 17 at *67. In *Black*, the California Supreme Court held that

> the provisions of the California determinate sentence law simply authorize a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range. Therefore, the upper term is the 'statutory maximum' and a trial court's imposition of an upper term sentence does not violate a defendant's right to a jury trial under the principles set forth in *Apprendi*, *Blakely*, and *Booker*.

*People v. Black*, 35 Cal. 4th at 1254. Two years later, the rule announced in *Black* was abrogated by the United States Supreme Court's holding in *Cunningham v. California*, 549 U.S. 270 (2007). In *Cunningham*, the Court held that under California's determinate sentencing law, it is "the middle term prescribed in California's statutes, not the upper term, [that] is the relevant statutory maximum." *Id.* at 288. The Court explained that

> California's Legislature has adopted sentencing triads, three fixed sentences with no ranges between them. Cunningham's sentencing judge had no discretion to select a sentence within a range of 6 to 16 years. His instruction was to select 12 years, nothing less and nothing more, unless he found facts allowing the imposition of a sentence of 6 or 16 years. Factfinding to elevate a

18

1   sentence from 12 to 16 years, our decisions make plain, falls
    within the province of the jury employing a
2   beyond-a-reasonable-doubt standard, not the bailiwick of a judge
    determining where the preponderance of the evidence lies.
3
    *Id.* at 292.[4]
4
        On remand, the California Supreme Court explained in *Black II* that under *Cunningham*,
5
    "imposition of the upper term does not infringe upon the defendant's constitutional right to jury
6
    trial so long as one legally sufficient aggravating circumstance has been found to exist by the
7
    jury, has been admitted by the defendant, or is justified based upon the defendant's record of
8
    prior convictions." *People v. Black*, 41 Cal. 4th 799, 816 (2007) (*BlackII*) *cert. denied,* 128 S.Ct.
9
    1063 (2008). "[A]s long as a single aggravating circumstance that renders a defendant eligible
10
    for the upper term sentence has been established in accordance with the requirements of
11
    *Apprendi* and its progeny, any additional fact finding engaged in by the trial court in selecting
12
    the appropriate sentence among the three available options does not violate the defendant's right
13
    to jury trial." *Id.* at 812.
14
        Alleged sentencing errors are subject to harmless error review by this Court. *See Estelle*
15
    *v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to
16
    reexamine state-court determinations on state-law questions. In conducting habeas review, a
17
    federal court is limited to deciding whether a conviction violated the Constitution, laws, or
18
    treaties of the United States."). In *Butler*, the court held that
19
                [a]pplying *Brecht v. Abrahamson*, 507 U.S. 619 (1993), we must
20          determine whether 'the error had a substantial and injurious effect
            on [the] sentence.' Under that standard, we must grant relief if we
21          are in 'grave doubt' as to whether a jury would have found the
            relevant aggravating factors beyond a reasonable doubt. Grave
22          doubt exists when, 'in the judge's mind, the matter is so evenly
            balanced that he feels himself in virtual equipoise as to the
23          harmlessness of the error.'

24  ───────────────
        [4]*Cunningham* did not announce a new rule of constitutional law. *See Butler v. Curry*, 528
25  F.3d 624, 639 (9th Cir. 2008). Therefore, its application in this case is not barred by *Teague v.*
    *Lane*, 489 U.S. 288 (1989), as urged by Respondent. This Court will thus apply the holding in
26  *Cunningham* retroactively on collateral review.

*Butler*, 528 F.3d at 648 (citations omitted).

An *Apprendi* error is not harmless when a court is left with grave doubt "as to whether a jury would have found, beyond a reasonable doubt" that a particular fact was present. *Butler*, 528 F.3d at 651; *United States v. Locklin*, 530 F.3d 908, 912 (9th Cir. 2008) (explaining that an error that violated *Apprendi* was not harmless because " there was no evidence adduced at trial that would have supported a jury finding as to the charged underlying offense"). The inquiry changes slightly in the context of California's determinate sentencing law system. "Under California law . . . only one aggravating factor is necessary to set the upper term as the maximum term. Any *Apprendi* error therefore will be harmless if it is not prejudicial as to just one of the aggravating factors at issue." *Butler*, 528 F.3d at 648.

In sentencing Petitioner to the upper term on count II, the trial court stated that

> there are a number of circumstances in aggravation, that is [1] the manner in which the crime was carried out indicates planning, sophistication and/or professionalism. [2] The defendant has engaged in violent conduct which indicates a serious danger to society. [3] He served a prior prison term. [4] He was on probation—parole when this crime was committed. [5] His prior performance on probation or parole is unsatisfactory. The court does not find any factors in mitigation.

(Doc. 26) (citing RT at 1113-14).[5]

---

[5]The trial court imposed "the upper terms of six years and stay[ed] that sentence pursuant to section 654 of the Penal Code as this offense was committed in commission of murder and that crime is charged in Count 1." (RT 114:8-11).
Penal Code § 654 states that
> (a)An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

In *People v. Niles*, 227 Cal. App. 2d 749 (1964) the trial court, after a conviction of burglary and felonious assault, sentenced the defendant to prison on both counts, but on the offense of assault, it granted a stay of execution pending appeal and service of the burglary sentence, and ordered that the stay would become permanent on completion of the burglary sentence. *Id.* at 756. In

(continued...)

1    Petitioner contends that the above-mentioned five aggravating factors were not submitted

2   to a jury to find beyond a reasonable doubt.  Respondent argues that *Cunningham* does not

3   require reversal of Petitioner's sentence because the trial court reasonably based the upper term

4   sentence upon two aggravating factors that were found by the jury and three additional factors

5   established by evidence of Petitioner's prior conviction.

6    The first two factors relied upon by the trial court in its sentencing decision were

7   necessarily found by the jury to be true beyond a reasonable doubt.  Count II of Petitioner's

8   conviction concerns possession of a weapon by an ex-felon.  The jury convicted Petitioner of

9   first-degree murder with a gun-use enhancement.  The jury's verdict demonstrates that the jury

10   determined that Petitioner used a gun to kill Marquez and that the killing constituted

11   premeditated murder.  Petitioner admitted the third aggravating factor at trial:  that he served a

12   prior prison term.

13    Thus, Petitioner's criminal history and the jury's finding that the offense involved use of

14   a gun and a premeditated murder establish three aggravating circumstances that independently

15   satisfy Sixth Amendment requirements and render Petitioner eligible for the upper term.

16   "[U]nder Supreme Court precedent, 'as long as a single aggravating circumstance . . . has been

17   _____

18    [5](...continued)
affirming the judgment and sentence, the California Court of Appeal held that

19

20        the procedure adopted by the trial court in this case was a
        reasonable-and so far as we can see the only possible-reconciliation
        of the various policies involved. Any other method either incurs the
21        risk of letting a defendant escape altogether, or else imposes an
        unnecessary burden on an appellate court and on the trial court on the
22        inevitable remand for correction of sentence. The procedure here
        affords appellant the maximum protection to which section 654
23        entitles him and, under no condition, can operate to his prejudice.

*Id.* at 756.

24    Here, the trial court stayed the execution of the sentence imposed on count II pending appeal,
in compliance with *Niles*.  Petitioner's conviction under count I became final on  July 11, 2006,
25   ninety days after his petition for review was denied by the California Supreme Court. *Bowen v. Roe*,
188 F.3d 1157, 1158-59 (9th Cir. 1999).  The stay then became permanent on July 11, 2006 when
26   Petitioner's sentence of life without possibility for parole under count I became final.

1   established in accordance with the requirements of *Apprendi* and its progeny, any additional fact

2   finding engaged in by the trial court in selecting the appropriate sentence . . . does not violate the

3   defendant's right to jury trial.'" *Butler*, 528 F.3d at 642 (citation omitted).  Petitioner was not

4   legally entitled to the middle term, and his Sixth Amendment right to jury trial was not violated

5   by imposition of the upper term sentence for his felon-in-possession of a weapon offense.

6                                                          **8**

7           In his eighth claim, Petitioner contends that he was deprived of the effective assistance of

8   counsel in violation of the Sixth Amendment.  Petitioner maintains that claims 1-6 of the instant

9   application present separate claims that, even if found not be in violation of a constitutional right

10  separately, demonstrate cumulatively that he was deprived of the effective assistance of counsel.

11  The alleged deficient performance by defense counsel includes failure to object throughout the

12  trial to: improper admission of character evidence (claim 1), incomplete jury instruction (claim

13  2), admission of opinion testimony (claim 3), prosecutorial misconduct during closing arguments

14  (claim 4), admission of improper witness testimony (claim 5), and admission of hearsay

15  testimony (claim 6).

16          The California Court of Appeal dismissed all of the claims alleging ineffective assistance

17  of counsel, concluding that there existed a plausible explanation for counsel's conduct that did

18  not negate counsel's competency.  *Victor*, LEXIS 17 at *69.

19          The Supreme Court held in *Strickland v. Washington*, 466 U.S. 668 (1984) that the

20  defendant, in claiming ineffective assistance of counsel, must establish that (1) "counsel's

21  performance was deficient;" and (2) "the deficient performance prejudiced the defense." *Id.* at

22  687.  *Strickland* stands for the proposition that the "benchmark for judging any claim of

23  ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

24  adversarial process that the trial cannot be relied on as having produced a just result."

25  *Strickland*, 466 U.S. at 686.  The Supreme Court instructed in *Strickland* that "judicial scrutiny

26  of counsel's performance must be highly deferential." *Id.* at 689.  Petitioner argues that based on

1  the totality of the circumstances, defense counsel's performance fell below an objective standard

2  of reasonableness and as a result casts doubt on the reliability of his trial.  Petitioner argues that

3  "there simply could be no satisfactory explanation for [counsel's] conduct and the claim of

4  ineffective assistance of counsel should be sustained on this record."

5         The California Court of Appeal held that it could not be said that there was no reasonable

6  explanation for counsel's actions or omissions during trial.  It offered hypothetical explanations

7  for the reasons that may have motivated counsel not to object based on "sound tactical choice."

8  *Victor*, LEXIS 17, at *69.  To avoid applying hindsight to counsel's performance, "a court must

9  indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

10  professional assistance.  *Strickland*, 466 U.S. at 689.  It is possible that defense counsel may

11  have failed to object to certain evidence at trial in an attempt to not attract further attention to

12  aspects of Petitioner's case that portrayed him in a negative light.   Petitioner has failed to

13  establish that the decision by the Court of Appeal was contrary to, or an unreasonable

14  application of the law established in *Strickland*, or any other clearly established federal law as

15  determined by the United States Supreme Court.

16  **9**

17         Petitioner's ninth claim is whether, when viewed cumulatively, a due process violation

18  resulted from the individually harmless errors committed during Petitioner's trial.  Petitioner

19  contends that if the Court finds that the individual errors alone do not constitute a constitutional

20  violation, then this Court must consider whether the combination of errors created a prejudicial

21  effect in violation of the constitution.

22  **A**

23         The California Court of Appeal reasoned that while certain harmless errors occurred

24  during trial, the evidence of Petitioner's guilt was so overwhelming, that "there is no reasonable

25  probability of a more favorable verdict in the absence of the errors."  *Victor*, LEXIS 17 at *70.

26  In acknowledging the errors that did occur, the Court of Appeals outlined the overwhelming

1    evidence of Petitioner's guilt:

2
> On the one side, we have found harmless errors or harmless potential
3
> errors in some of the prosecutor's closing comments about the prior-
> offense evidence, the prosecutor's use of a photograph not in
> evidence, the omission of an instruction on imperfect self-defense,
4
> the admission of opinion testimony about a witness's veracity, and
> the admission of hearsay statements in contravention of *Crawford v.*
5
> *Washington*, *supra*, 541 U.S. 36. On the other side is the evidence–
> contradicted only by defendant's self-serving assertions–that
6
> defendant bought a gun, told multiple witnesses of his intention to
> kill the victim, shot him while his back was turned, fled, and
7
> repeatedly incriminated himself while holding police at bay for
> hours.

8 *Id.*

9        The Court of Appeal concluded that the errors taken cumulatively do not establish that

10 Petitioner's due process rights were violated in the face of the overwhelming evidence against

11 him.  The cumulative error doctrine holds that the cumulative errors must have "rendered the

12 criminal defense far 'less persuasive'" and resulted in "a 'substantial and injurious effect or

13 influence' on the jury's verdict."  *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (quoting

14 *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)).  *Strickland* held that "a verdict or

15 conclusion only weakly supported by the record is more likely to have been affected by errors

16 than one with overwhelming record support."  *Strickland*, 466 U.S. at 696.   The Court of Appeal

17 reasonably concluded that the overwhelming evidence of Petitioner's guilt negates any

18 constitutional claim based on cumulative errors.

19                                         **V**

20        Accordingly, it is HEREBY ORDERED that:

21    1.     Petitioner's application for writ of habeas corpus is DENIED.

22    2.     The Clerk of Court is directed to enter judgement in favor of the Respondent and

23           close the case.

24 DATED: October 22, 2008

25                      /s/ Arthur L. Alarcón
                                      UNITED STATES CIRCUIT JUDGE
26                                       Sitting by Designation